My name is C.J. Blanchard and I'm from Las Vegas Metro. I'm here to represent the Cali-Cristina Palos District. We're trying to reserve a couple minutes for you, but all the people I don't know at the moment will be in place at 11 o'clock. This court should reverse the District Court's grant of summary judgment. Mr. Jury is entitled to determine whether Officer Blanca, clearly in the form of evidence of prohibition against obsessive force, when he took Mr. Palos to the ground on hot asphalt, subsequently, even though he knew how to use the air gun, held there on the asphalt for three minutes, at least three minutes, while taking her to the second and third degree room, and then gone to her seat. Now, in regards to earlier facts in this case, I'd like to begin by addressing why it was an error for the District Court to grant summary judgment overlooking the numerous disputed facts in this case. Those facts, the reason the jury was all in Blanca's favor, whether Officer Blanca gave Ms. Palos any commands before he made the decision to take her down onto the asphalt. Well, Jury, I just want to cut in, because it seems to me you're not arguing on pretty strong ground if you're complaining about anything related to the takedown. She did lunge at him, and I have to understand her. So I kind of credit and kissed your client the first two minutes or so while he was on the ground. But then, once other officers arrived and she's been handcuffed, I take it there's another two and a half minutes where she's just left there on the ground. I'd seem to be that was your best hope, but still, I'm worried about that. Absolutely. When you're looking at the totality of the circumstances, the decision to take her down plays into that as well. Certainly, the most egregious one is when she's controlling, she's using her cuff, and he's crouched down, holding her down on the asphalt. That's all I'm going to say. Hold her down? I don't know. I'm sorry, Your Honor. Where do you get the holding her down from? She's handcuffed on the video, and it seems her crouched. I think a reasonable juror would appear to have been holding, at least has contact with her and holding her in place. She's obviously not free to leave. She's testifying. So she's requesting, I want to stand up. He won't let her stand up. The officer, on himself, clearly is in dispute with the briefs. My reading concedes that he held her down. And that's during the filing. She is still resisting, is it not? There's a factual dispute whether she's resisting or not. When she's handcuffed and on the ground and under his control, she's subdued at that point. She's not resisting once she's on the ground. So the constitutional obligation at that point is to get her out. But he can certainly just lay down across the road. That's not the thing to give the person up, particularly in the cases where we're not in the position in this case to get cases. But that's part of the standards rating. I don't place it in. You can take someone down. You can handcuff them and get them back up. And that's where the excessive force particularly comes in on this case. And that's something the district court will cover a lot. But the district court's order is primarily concerned, or rather much the order, because of minimizing the seriousness of the injuries that she suffered, which there's photographic evidence. They're very egregious burns. They're not just, you know, like a sunburn or something minor. We all know how painful it is if you just burn a little bit of your finger. There's thousands of burns on her face and torso. Almost her entire body. So if we're just concerned with the last two minutes or the period after which the other officers arrive on the scene, at that point in time, Looking at that, what is the clearly established constitutional right that you think is being violated? It's holding her on pavement. Well, at that point, they're not holding her anymore. It's all according to the video. After the other officers arrive, she may remain on the pavement, but she's not being held. So at that point, are you saying, or maybe there's not at that point, a clearly established? There certainly is clearly established law. The Howard opinion out of Kansas City, the 8th Circuit, talks about when somebody's on the ground, it's the same thing as a burn case. It's pavement contact burns. And that case, I think, particularly persuasive here because it cites Alexander County, Los Angeles, 9th Circuit case. Although it's, you know, a slightly different patch and pattern. There were a little bit in 2002 in the Howard case that it's clearly established that a large environmental conditions can cause those problems. They also cite the price of district court case. I don't think there's a difference between the Kansas City court versus that person who wants to be quite persuasive for a pavement pattern. A burn, if you were suffering, and your client knew how to stand up and stand up to you, she never said, hey, I'm being burned, and the officers aren't getting me. She may not have said that, but there is an actual misview whether or not that she complained of pain. She testified she was screaming out in pain because it hurt so bad. She also testified that she said, oh, I want to stand up, get me up, because it was burning her. That's at 345, and that's her letter. She said, I asked to stand up, and she explained that the reason she was asking me to stand up was because he was burning her. I was getting buttocks. Your position, I guess, has to be that every single reasonable officer in the country for burning someone's face would know that after that amount of time on the pavement, I don't know what the temperature was, but it was probably above 100 degrees, and he was wrapped in a test on the record, because the temperature cannot fall in the range of 160 degrees, but it is. And that's what distinguishes it to another case, the published case that the officers cite to, I don't know, 40 years old, but it's not common knowledge in the pavements and features they hunt. In Arizona, Las Vegas, Jalisco, California, those communities, it is common knowledge that the pavement is haunted. I mean, every child in a school that cooked eggs on the asphalt in Las Vegas in science class in the boys' towns, it's well known that the pavement is intrinsically haunted. Every reasonable officer would know that. People that walk their dogs on the asphalt in August when it's over 100 degrees because it's an emergency, you know, it's made visible to them, and that's why it is clearly established. It's not just the opinions. I mean, I think there was an officer on Goldberg that said something to the effect of explaining that they're not trained on this, which, you know, goes without saying, but it's just merely mentioned in briefings, but he said it's kind of a common sense thing with the temperature. Your Honor, Judge Crawford, I wanted to say, I think there's a natural issue of whether she can play the same thing I'm saying, that Baca says. At the same point, we recited a reply where he says something about cooling down. I think there's some speed on that, too. I have seen that when he has crouched while you're asking for her, she certainly did not frequently. But he says, I don't remember what she was saying at that time, so he doesn't... I remember the basic, the kind of the infatuation on both sides being that, yes, she was screaming, but the screaming was no different from the screaming that had occurred during the initial confrontation. She just had control the whole time. She certainly wasn't emotionally disturbed. It's another infatuation that was made up for in the screaming. I don't know if that actually goes into the reason it was, too. But I don't know that it was exactly the same screaming. She was screaming, subsequent to the accident, and then afterwards. She says her testimony is, I was screaming, but does it burn so bad? Is this worse than the infection she's up to now? Does it hurt so bad that she felt like she would do worse? Well, he says here she's testifying to later, which that's not what she said at the time, right? It is what she said, but she's testifying later. Obviously, it's a different position. But she says, I was asking you to stand up when I was screaming out because I was in so much pain. And I think that's a reasonable judgment. There's all of that in our favor, and that's what we're looking at in summary judgment. The other screaming attacks that I mentioned, whether it gave the command to anyone, she's on the ground. It goes to whether she's emotionally disturbed. But Baca apparently indicates that he caused the burn. It's all in the medical testimony. She was immediately transferred to the EMC. So she only goes to the burn center. It's immediately adjacent to our university hospital. Whether she was actively resisting at that point, when she's handcuffed to some damp, whether those, you know, her screaming and saying, yeah, we have constitutes of a point of pain. And then also, when we were looking at the seriousness of the fire, which were real factors, whether she did, in fact, try to steal the gun or her arms fell out in the video. But there's nothing mentioned at the time. Certainly, if it was, you know, trying to steal a gun, there's not an issue in the journal. It doesn't report. So in case she would have referenced something like that, that's not here on the record. And also, the stealing of a vehicle. The individual is another important factor. During the heat, she gets in her vehicle, her legs hanging down. Mr. Larson, where she then takes the keys, and let's just not deal with this, and she gets out. The officer took no keys yet at the time, right? The officer arrives at that point when she's out of the view. So I mean, he at least knows that she's there in active search, pacing back and forth. And at the time that he goes to the arms, while he's on the ground, her back is turned out, her hands are on her side, and she's looking at her in the middle, almost as if she's looking at him, at least for like minutes, looking at what video is at that point. I'll say, I don't know, I don't know. I'm sorry for the defective speech. I'm sorry. I'm sorry. I'm sorry. Thank you. We are, of course, a pre-game. So if you have anything that's difficult, you can just report it to the officer, and we'll report it to the officer as soon as we can. I agree with the position of the person. Speaking with respect to the time, we always end up arguing the entire game. So it's an interesting conversation. It still arises if we're only looking at the last 20, 40 seconds. I agree with you, but that's not going to help me, because I just want to focus on the conversation itself. So let's focus on Cameron Burr. He's a BACA expert, the first officer. Yes, he's got the hardest case that you've had here, because he doesn't know that she's already been on the ground for what, two and a half minutes? Once the other officers arrive, once they're back, it seems like it would have been safe to turn and move her as we eventually get to a place where it's shady. I don't think that would have been correct. And I'm not breaking my own comments. I don't want to go over to officers who are non-visual officers. That's what I'm saying. So for those who say they don't know that Carole Walsh is not on the ground, but the officer on the ground does, and why isn't it unreasonable? Not only that she's been in contact with David, because we're talking about protection, but there's a way out there for her already to have been. She's fine and secure. Other officers are there. There's no good reason that I can see on the record why he didn't completely say, okay, we need to get her officers. Okay, and that's his testimony. As soon as it was safe to do so, he did get her on film. The following day, his video stops, and you then have a poll blocking the video. So when we see her walking away as two minutes and 40 seconds, there's no evidence that she was on the ground for that entire two minutes and 40 seconds. It's just the facts are taken in her favor. She doesn't say she was on the ground that entire time. The officer thinks that she was on the ground the entire time. So she could have been standing up immediately after that video. That's not something that we're sure we would have to have solved, but to say that is not a reason. And I told you in this case, in fact, it's been a very violent struggle. There's been three car accidents. He has to control all of these car owners. He is not the only one who has an officer's record. That's why I give you the first two aspects, because it's by himself, the security person. But he doesn't have a backup. Once the backup arrives, then it's just the end of evidence. He is restrained. So the danger that she posed to him and to the other people, that's been completely eliminated. What's the justification for making her sit there potentially at least for two and a half more minutes? His case was as follows. He was a good managerial officer. That's why he was alone. He was taking away the danger of over at that point. It was not a small amount of pain on over. But the justification that he took from the other officers to give correctives to what's going on, I'm sure they need to be briefed. And it's not ideal. I'm not going to argue that this is the best. But, again, still there are some police activities that need to take place. But this is still, now that we're looking at it from the client's side, that it's clear how to just get her off the ground would have been the best choice. But they were still looking at this solely and trying to figure out what was going on. But even if any of the correctives was loosed, and it was a lot more reasonable, or at least what the fact is, there would be no clear example, so I'm going to have to say I'm probably for qualifying analysis. Child Officer Baca, people who requested sentences of loss and gave what they were doing was clearly not supposed to do. So I don't want to overstate that. Because the common sense is, as your client mentioned, you only block their dogs on paper. So why would you have to give two and a half minutes to that situation if that's just what happened because she's traveling? But two and a half or four minutes of attention, that's a lot more time than that's what I just said. So why wouldn't a reasonable officer know that? No, five minutes total, that's probably going to cause some serious injury. Well, let me see. In the case law, there's a co-officer in Baca who wanted to be able to raise a price case, which is not liable to the district or case. They left an individual hontied on the ground for several minutes by the officers who couldn't monitor the person. And the San Diego court found that it was not a reasonable, even more than fairly established rule, that it was not. Rubio v. Lopez just went on the ground for a case of that. And the Martin Luther Circuit published a case of that and it was not a reasonable and, again, there would have been those that would have been established laws. And in the only other case, Billings Howard, which is easily distinguishable because the whole focus of that case is the containment of the military payment. In the Howard court address, the fairly established rule, they focused exclusively on the individual who complained for seven minutes that he was being burned. They didn't say it would be common knowledge that you would know the paper was hot or that it would be common knowledge that an officer would know. If it were common knowledge, would that create a clearly established right not to remain on the pavement? I don't think so under the way the Supreme Court is doing right now with the law-finding and the genetic analysis. At the time of this decision, she had worked with the most recent case, which the Supreme Court has applied a cross consensus of legal cases. So, for example, if the police department itself trained and had reminders, which I believe is the case here, that you're not to leave someone on hot asphalt longer than it's necessary, then that would at least make it common knowledge or well understood. But we're just saying that's not enough. Yeah, well, the training is that you get someone off the ground who wasn't a safe doer. So as soon as you can, who wasn't a safe doer, something's going to happen. That's one of the kind of reasons for this case. But I don't think that the training alone would say that two minutes and 40 seconds is unreasonable. That that is enough to put an officer on notice that you are going to violate the Constitution once those are committed to two minutes and 40 seconds. Exactly. It's more like five minutes. There's a problem with the release for officer, but I just don't think you ever need to have this issue included because those issues already have been in contact with people in that room. So it's really five minutes. If you count them, which is from what I was using, it is seven or eight or nine. Okay, but that's starting to get closer to five. So we can accuse this as five. Well, I think what you have is a fairly established law that if the person was complaining, that you were getting those complaints, that the individual is in discomfort, whether that's handcuffing, whatever the type of force that's being applied is, that the officer has to act reasonably. Once they're on notice here, he had an individual that was acting disoriented, yelling and screaming the entire time, and so he never really noticed that the injuries were occurring. And what she talks about in her deposition that she was screaming because of the pain, that's after she'd been removed. She said she was sitting on a curb, which there's no evidence that ever happened. She said that was after she was removed from the jail and seated on her buttocks on a curb. No one ever saw that or testified that that was ever done, but that's when she said she was screaming that they should have implied that that was her pain. But, yeah, the fairly established law right now, and I would go back to the Price case, is that it says several things. It says that the individual is left on a hot pavement for several minutes and admitted that that was not unreasonable based upon all the other factors that police officers are doing in these situations. And in Price, there was this one person, there were multiple officers on scene from the beginning, and the court did find that unreasonable. So I don't think there is any fairly established law that would have told Officer Baca, if you leave from the restroom two minutes before he said that and after he had nothing to say, you will be lying under the Constitution. And all the case law that you've seen and if you've read at all would imply that what he was doing was okay. There would have been nothing to tell him if he were in trouble for this reason. The point I would like to make on Wilbur and Swan is they're not even there on the video, so they are not on scene at all during this incident. Officer Long-Gulper and Wife Lake, he was in the vehicle, he was in the car, Officer Swan was a traffic officer, he was seen in the accident. They're not the officers you see on the video. And so the earlier interview was not what they did. This is wrong. They're not even the officers that they're referring to. Any other questions? Okay. Thank you very much, sir. We appreciate it. We appreciate it. Thank you, sir. Thank you, sir. Thank you, counsel. And then for the public. Thank you. Go ahead. I just wanted to address the point about the equipment was priced. Priced is entirely, I mean, not only is it a district court case, but where you're out serving judgment, price got to the fact finder, that was a bench trial, and the judge made the determination. We have got to the fact finder, I think we have enough to get there. But the price, as you read the analysis, it's not, they didn't say it was on a reasonable basis. It was a reasonable because it did not cause burns. The injury inflicted is a factor. You can look to a memorandum in this case. I've heard you guys can look at 455, which is the photograph of her burn. They're very severe. That is a factor that we can consider. But you would acknowledge that those photos were taken later, and experts would say the appearance of that burn would not be the same as at the time. No one would have seen what you've been in those photos. You guys would have definitely gotten more scared because the burns were so severe going all the way through the dermis, the epidermis and other dermis. But Sgt. Hardy, who submitted an affidavit to this, concedes that her injuries appeared aspiration, so there were injuries less than half the time. And, you know, like I said, Howard also disavows it. Not only that, we have a prior lawsuit. I'm glad to have been sued prior, but at the same time, we've had an injury, and there are numbers of that. In America, we don't have to study AIDS early as 1995. We've seen it as well. In the desert, you get dangerous, and people don't do much to cause it, and they're doing burns. I wanted to just quickly on the representation of it. Mark is not there at the time. She's down at, I think, at the reply break at 255. He said he should be in school there after the end of the timeline of that incident. It's a 24-hour time of 15, 18, 35 is what she's given to us. Other officers arrive at 15, 19, 50. And then the video does end, but we don't see her back up until 15, 22. So at the middle of history, it's day one of the facts in our favor. It could be anywhere, but I expect them to have to get to a term that I wouldn't know they're getting. Okay, thank you, Johnson. I appreciate the arguments this morning. And in case you started, you can go upstairs.
judges: Fernandez, Watford, Staton